UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| SANDRA DELSING, individually and on behalf of other class members, and AMBER BOLENG, individually and on behalf of other class members, | Case No. 08-CV-1154 (PJS/JSM) |
| Plaintiffs, | ORDER ON MOTIONS FOR SUMMARY JUDGMENT AND CLASS CERTIFICATION |
| v. | |
| STARBUCKS COFFEE CORPORATION, | |
| Defendant. | |

E. Michelle Drake and Paul J. Lukas, NICHOLS KASTER, PLLP, for plaintiffs.

Gregory W. Knopp, Daniel L. Nash, Nathan J. Oleson, and Jessica W. Paniccia, AKIN GUMP STRAUSS HAUER & FELD LLP; Joseph G. Schmitt, HALLELAND LEWIS NILAN & JOHNSON, P.A., for defendant.

Plaintiffs Sandra Delsing and Amber Boleng, who formerly worked as baristas for defendant Starbucks Coffee Corporation, brought this lawsuit on their own behalf and on behalf of a putative class of current and former Starbucks employees to challenge the manner in which Starbucks distributes tips placed by customers in tip jars. Delsing and Boleng now move for summary judgment and for class certification under Fed. R. Civ. P. 23(b)(3).[1] Starbucks opposes class certification and also moves for summary judgment. For the reasons that follow, the Court denies plaintiffs' class-certification motion and grants in part and denies in part the parties'

---

[1]Plaintiffs' class-certification motion refers to Fed. R. Civ. P. 23(b)(2), not (b)(3). Pl. Mot. Class Cert. at 1 [Docket No. 32]. This appears to be a typographical error, as plaintiffs' memorandum in support of the motion is directed to class certification under Fed. R. Civ. P. 23(b)(3). Pl. Mem. Supp. Mot. Class Cert. ("Pl. Class Cert. Mem.") at 16-20 [Docket No. 34].

summary-judgment motions.[2]  Specifically, the Court holds that the manner in which Starbucks

distributes tips among employees violates Minnesota law.

## I.  BACKGROUND

Delsing and Boleng worked as baristas at a Starbucks store in Cottage Grove, Minnesota.

Delsing worked there for about a year and a half, from late 2005 to early 2007.  Boleng worked

there for about two years, from August 2006 to August 2008.

Generally speaking, Starbucks employees can clock in as working either "coverage" or

"non-coverage" hours.  An employee generally provides direct customer service while she is

clocked in as working "coverage," although she may perform modest amounts of indirect service

(such as wiping tables or restocking cups and lids).  An employee generally provides indirect

service while she is clocked in as working "non-coverage."

At the Cottage Grove store, as at other Starbucks locations, customers deposit tips in a tip

jar on the counter.  Those tips are collected by shift supervisors or managers and kept in a safe at

the store.  Once a week, the tips are totaled up, and the tips are then distributed to individual

employees in proportion to the number of coverage hours — also called "tippable hours" — that

each employee has worked during that week.  Starbucks does not require store managers to keep

records related to tips, although informal records may occasionally be kept by some managers at

some stores.

---

[2]As a formal matter, Starbucks moved for summary judgment only with respect to the
claims of Delsing, not those of Boleng.  Def. Mot. S.J. at 1 [Docket No. 52].  But plaintiffs
acknowledge that "none of the arguments raised in Defendant's motion for summary judgment
are unique to Plaintiff Delsing."  Pl. Mem. Opp. Def. Mot. S.J. ("Pl. SJ Opp.") at 3 [Docket
No. 67].  Because none of the parties' summary-judgment arguments is specific to one plaintiff
or the other, the Court addresses Delsing's and Boleng's claims together in this Order.

Plaintiffs contend that Starbucks violated Minnesota law by redistributing tips in this manner and by failing to keep tip-related records.

## II.  DISCUSSION

### A.  Class-Action Certification

Plaintiffs ask the Court to certify this case as a class action under Fed. R. Civ. P. 23(b)(3). Specifically, plaintiffs ask the Court to allow them to represent a class consisting of "all individuals who were employed as baristas or shift supervisors by Defendant on or after March 26, 2005." Pl. Mot. Class Cert. at 1 [Docket No. 32]. Plaintiffs do not mean this literally; they seek to represent only individuals who were employed *in Minnesota* as baristas or shift supervisors on or after March 26, 2005. Pl. Mem. Supp. Mot. Class. Cert. ("Pl. Class Cert. Mem.") at 10 [Docket No. 34].

Every class action must meet the four requirements of Rule 23(a). First, the class must be "so numerous that joinder of all members is impracticable" (the "numerosity" requirement). Fed. R. Civ. P. 23(a)(1). Second, the case must present "questions of law or fact common to the class" (the "commonality" requirement). Fed. R. Civ. P. 23(a)(2). Third, the class representative's claims or defenses must be "typical of the claims or defenses of the class" (the "typicality" requirement). Fed. R. Civ. P. 23(a)(3). And fourth, the class representatives must "fairly and adequately protect the interests of the class" (the "adequacy" requirement). Fed. R. Civ. P. 23(a)(4). Rule 23(b)(3) class actions must meet further requirements of "predominance" and "superiority." That is, a court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class

action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Plaintiffs bear the burden of showing that the class should be certified and that the requirements of Rule 23 are met. *Coleman v. Watt*, 40 F.3d 255, 258 (8th Cir. 1994). District courts have wide discretion in determining whether certification of a class is appropriate. *Coley v. Clinton*, 635 F.2d 1364, 1378 (8th Cir. 1980). But district courts must exercise that discretion within the standards set by Rule 23, which requires a "rigorous analysis" to ensure that class certification is appropriate. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982).

In deciding whether to certify a class under Rule 23, a district court may not consider whether plaintiffs have a strong claim on the merits. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974). In other words, a district court may not deny class certification because it views the plaintiffs' claims as weak or grant class certification because it views the plaintiffs' claims as strong. Nevertheless, a district court may look beyond the pleadings and assess the state of the evidence. In particular, a district court may analyze what the plaintiffs will have to prove and how the plaintiffs will have to prove it. *See Elizabeth M. v. Montenez*, 458 F.3d 779, 786 (8th Cir. 2006) ("Though class certification is not the time to address the merits of the parties' claims and defenses, the 'rigorous analysis' under Rule 23 must involve consideration of what the parties must prove."); *Blades v. Monsanto Co.*, 400 F.3d 562, 566-67 (8th Cir. 2005) (in determining whether common issues predominate, courts may resolve factual issues to the extent necessary to determine whether the same evidence will suffice to prove the claims of all class members).

The parties do not dispute that the proposed class, which includes roughly 5,000 people, meets the numerosity requirement of Rule 23(a)(1).  Starbucks does, however, contend that the case should not proceed as a class action because it would be difficult to ascertain who is a member of the proposed class.  Def. Mem. Opp. Pl. Mot. Class Cert. ("Def. Class Cert. Opp.") at 17-20 [Docket No. 44].  Starbucks's argument confuses the merits of plaintiffs' claims with the ascertainability of the proposed class.

No one can seriously argue that the proposed class, as defined by plaintiffs, is vague.  The class's membership can easily be determined by inspecting Starbucks's payroll records.  Starbucks's real argument is that some of the members of the (readily ascertainable) proposed class suffered no damages and thus have no right to recover.  But the question whether and to what extent individual class members suffered harm is, in this case, separate from the question whether the class's membership is ascertainable.[3]  *See Elizabeth M.*, 458 F.3d at 786.  The Court finds that "the class description is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member."  7A Charles Alan Wright et al., *Federal Practice and Procedure* § 1760 at 140 (3d ed. 2005).

Starbucks also contends that the proposed class should not be certified because class members have antagonistic interests.  Def. Class Cert. Opp. at 20-23.  Starbucks frames this argument in terms of the adequacy requirement of Rule 23(a)(3), saying that plaintiffs cannot adequately represent the proposed class because the interests of plaintiffs — who are *former*

---

[3]The two questions could overlap in a different case, depending on how the proposed class was defined.  For example, a proposed class defined to include only those who were "injured" by a particular act of a defendant's would include only those who in fact suffered harm. But plaintiffs propose no such class definition in this case.

Starbucks employees — are opposed to the interests of the many *current* Starbucks employees who are included in the proposed class. *Id.* at 21. Courts sometimes describe the existence of a conflict of interest between class representatives and class members as going not only to the adequacy requirement of Rule 23(a)(3), but also to the typicality requirement of Rule 23(a)(4), because the claims of class representatives cannot typify the claims of other class members if the class representatives and class members have conflicting interests.[4]

No matter how the issue is characterized, the Court agrees that class certification is inappropriate in this case because the interests of plaintiffs are directly opposed to the interests of at least a substantial portion of the proposed class. To assess when such intra-class antagonism renders a proposed class representative's claims atypical or otherwise renders the proposed class representative inadequate, courts must look carefully at each case's facts. Because the inquiry is so fact-specific, it is hard to generalize about how much intra-class conflict is too much conflict for class-certification purposes.[5]

---

[4]*See generally* 7A Charles Alan Wright et al., *Federal Practice and Procedure* § 1769 at 438-41 (3d ed. 2005) ("Generally, if the representatives' interests are coextensive with those of the rest of the class, they will not be viewed as antagonistic, a key factor in determining the adequacy of representation. . . . Coextensiveness has also been viewed as part of the requirement in Rule 23(a)(3) that the claims of the representatives be typical of those of the absent class members. Thus, courts have noted that coextensiveness is a common thread binding Rule 23(a)(3) and Rule 23(a)(4) together.").

[5]*See* 7A Charles Alan Wright et al., *Federal Practice and Procedure* § 1768 at 389-93 (3d ed. 2005) ("It is axiomatic that a putative representative cannot adequately protect the class if the representative's interests are antagonistic to or in conflict with the objectives of those being represented. But only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status. Beyond that straightforward proposition, defining the level of antagonism or conflict that should preclude class certification is a more difficult proposition."); 1 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 3:26 at 433-34 ("In certain situations of alleged conflict, there is a direct inverse relationship with the expected vigor of prosecution. However, in other situations of alleged conflict, or when the individual

The conflict in this case, however, is palpable.  Under the challenged tip-sharing procedure, some employees come out ahead, and others come out behind.  Indeed, the essential purpose and the inevitable function of Starbucks's tip-sharing policy is to redistribute wealth: Employees who work shifts when tips are plentiful — because the shift is particularly busy, or because the workers are particularly skilled, or because the customers are particularly generous — end up subsidizing employees who work shifts during which tips are scarce.  If tips are shared only by workers on a single shift (as plaintiffs propose), rather than by everyone who works during a given week (as Starbucks's current practice dictates), some employees will gain while others will lose.  Put simply, the relief sought by plaintiffs will, going forward, take money out of the pockets of some members of the putative class and put that money into the pockets of other members of the putative class.[6]

---

circumstances, attributes, or motives of the plaintiff are challenged, such inverse relationship to vigorous prosecution does not necessarily arise, and there is no automatic bar to a finding of adequacy.  Though a plaintiff cannot be an adequate representative if he or she has a conflict of interest with class members, not every potential disagreement between a class representative and the class members will stand in the way of a class suit.").  *Cf. id.* § 3:30 at 449 ("Some courts have held that opposition to the suit, as opposed to disagreement over the appropriate relief, is not relevant to the class determination.  In other words, the class member who wishes to remain a victim of unlawful conduct does not have a legally cognizable conflict with the class representative.").

[6]Starbucks makes the puzzling argument that if plaintiffs prevail, Starbucks will have to remove its tip jars entirely, and thus *all* current employees will be harmed.  Def. Class Cert. Opp. at 21-22 ("If Plaintiffs prevail, Starbucks will have no choice but to remove the tip containers, either in response to an injunction or simply to avoid further monetary liability.").  If plaintiffs in fact sought to have tip jars removed entirely, plaintiffs' interest would conflict with the interests of all current employees, who would presumably rather get some tips than no tips.  But as plaintiffs made clear at oral argument — and as seems obvious to the Court — plaintiffs simply seek to change the way that tips placed in tip jars are distributed, not to eliminate tip jars entirely.  Moreover, allocating tips that are received during a shift among only the employees who worked on that shift does not create such daunting administrative problems as to make removal of the tip jar necessary as a practical matter.

Potential losers under a modified system obviously have no financial interest in changing Starbucks's tip-sharing procedure.  And even potential winners might prefer that the system remain unchanged if they value the benefits of the procedure — benefits that could include better overall morale and a heightened willingness of employees to help each other — over any financial rewards they might receive under a changed procedure.  Starbucks has provided affidavits from numerous current Starbucks employees who assert that they support the current procedure for tip sharing and oppose any changes to that procedure.[7]  Clearer evidence of intra-class conflict would be hard to come by.

Because the Court denies plaintiffs' class-certification motion on the basis of intra-class conflict, the Court need not address Starbucks's remaining arguments with respect to class certification.

### B.  Summary Judgment

### 1.  Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and

---

[7]*See, e.g.*, Ans Decl. ¶ 12 ("I believe it is fair how tips are currently distributed.  If we divided tips by shifts, the closing partners wouldn't receive an equal amount of tips, and they affect the opening partners' ability to open the following day — they set the openers up for success."); Barnette Decl. ¶ 13 ("I believe it is fair how tips are currently distributed and I would oppose any attempt to alter the current tip distribution system."); Boyce Decl. ¶ 11 (same); Brown Decl. ¶ 11 ("I believe it is fair how tips are currently distributed and I do not want the current tip distribution system to change.  I feel that I receive my fair share of tips based on the amount of customer service work I perform under the current system."); Craven Decl. ¶ 12 ("I believe it is very fair how tips are currently distributed, and I would oppose any attempt to alter the current tip distribution system.").  The cited declarations, along with declarations to similar effect from other current employees, are attached as Exhibit 1 [Docket No. 46] to Starbucks's memorandum in opposition to plaintiffs' motion for class certification.

that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute over

a fact is "material" only if its resolution might affect the outcome of the suit under the governing

substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a

fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for

either party. *Ohio Cas. Ins. Co. v. Union Pac. R.R.*, 469 F.3d 1158, 1162 (8th Cir. 2006). In

considering a motion for summary judgment, a court "must view the evidence and the inferences

that may be reasonably drawn from the evidence in the light most favorable to the non-moving

party." *Winthrop Res. Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 468 (8th Cir. 2004).

## 2.  Tip Sharing

Tip sharing in Minnesota is governed both by statute and by regulation. As relevant to

this case, subdivision 3 of Minn. Stat. § 177.24 provides:

> **Sharing of gratuities.**  For purposes of this chapter, any gratuity
> received by an employee or deposited in or about a place of
> business for personal services rendered by an employee is the sole
> property of the employee.  No employer may require an employee
> to contribute or share a gratuity received by the employee with the
> employer or other employees or to contribute any or all of the
> gratuity to a fund or pool operated for the benefit of the employer
> or employees.  This section does not prevent an employee from
> voluntarily and individually sharing gratuities with other
> employees.  The agreement to share gratuities must be made by the
> employees free of any employer participation.

Minn. Stat. § 177.24, subd. 3. The Court will refer to this as the "tip-sharing" statute.

Further, subpart 8 of Minn. R. 5200.0080 provides:

> **Divided gratuities.**  When more than one direct service employee
> provides direct service to a customer or customers in a given
> situation such as banquets, cocktail and food service combinations,
> or other combinations, money presented by customers, guests, or
> patrons as a gratuity and divided among the direct service

> employees is not a violation of Minnesota Statutes, section 177.24,
> subdivision 3.

Minn. R. 5200.0080, subp. 8.  The Court will refer to this as the "divided-gratuities" rule.

How these two provisions interrelate, and how they together govern Starbucks's tip-sharing policy, is the central issue in this case.  Unfortunately, neither Starbucks nor plaintiffs have proposed an entirely satisfactory construction of these two provisions.  This is understandable, as the tip-sharing statute and the divided-gratuities rule are poorly drafted, and the Minnesota appellate courts have said almost nothing about their meaning.

For its part, Starbucks says, first, that its tip-sharing procedure is not forbidden by the tip-sharing statute, and second, that the procedure is authorized by the divided-gratuities rule.  Def. Mem. Supp. Mot. S.J. ("Def. SJ Mem.") at 2-3, 10-19 [Docket No. 54].  With respect to the statute, Starbucks points out that the second sentence of subdivision 3 forbids an employer to require an employee "to contribute or share a gratuity *received by the employee*," whereas the first sentence of subdivision 3 refers both to a gratuity "received by an employee" *and* to a gratuity "deposited in or about a place of business for personal services rendered by an employee . . . ."  *Id.* at 17-18.  Starbucks contends that tips deposited in a tip jar are tips "deposited in or about a place of business," not tips "received by an employee," and therefore that the tip-sharing prohibition in the second sentence of subdivision 3 does not apply to tips placed in tip jars.  *Id.*

Starbucks's reading of the second sentence of subdivision 3 makes sense standing alone.  But Starbucks has not satisfactorily explained how, under its proposed approach, the Court should read the *first* sentence of subdivision 3, which defines *both* tips "received by an employee" *and* tips "deposited in or about a place of business for personal services rendered by

an employee" as "the *sole property* of the employee."  Minn. Stat. § 177.24, subd. 3 (emphasis

added).  If tips left in a tip jar are "deposited in or about a place of business" — as they plainly

are — what does it mean to say that those tips are an employee's "sole property"?  Can an

employee be forced to share her "sole property" with her coworkers?

Plaintiffs and Starbucks alike have not explained the consequences of defining tips

"deposited in or about a place of business" as the "sole property" of an employee, or how those

consequences differ (if at all) from the prohibition on tip sharing that applies under the second

sentence of subdivision 3 to tips "received by an employee."  Plaintiffs contend in one brief that

subdivision 3 forbids employers to require employees to share tips under any circumstances.  Pl.

Mem. Opp. Def. Mot. S.J. ("Pl. SJ Opp.") at 13 [Docket No. 67] ("[T]he question becomes

whether Defendant was forbidden from requiring Plaintiffs to share [tip-jar tips] with their

employer or with others.  Of course Defendant was so forbidden:  it was Plaintiffs' property.").

But elsewhere plaintiffs say that they "do not contest that partners who worked on the same shift

as one another could be required to share gratuities."  Pl. Class Cert. Mem. at 10.

Further, plaintiffs fail to explain how the divided-gratuities rule would apply to tips

deposited in a tip jar by multiple customers for the benefit of a group of direct-service employees.

Pl. SJ Opp. at 11-16.  Plaintiffs seem to say that the divided-gratuities rule covers only situations

in which a single customer (such as a banquet host) gives a tip to a group of direct-service

employees (such as banquet servers) who worked a single event (such as a banquet).  Pl. SJ Opp.

at 9-11.  At the same time, however, plaintiffs contend that the divided-gratuities rule "simply

requires that the people who share tips share 'customers.'"  *Id.* at 11.  Plaintiffs' two arguments

— that the divided-gratuities rule applies only when an event host is the single customer, and that

the rule also applies when direct-service employees share multiple customers — are difficult to reconcile.

The divided-gratuities rule does not expressly say that tip-sharing may be required among employees who work as a team.  But given that employees are already expressly permitted under the tip-sharing statute to "voluntarily and individually shar[e] gratuities with other employees," Minn. Stat. § 177.24, subd. 3, the most likely purpose of the divided-gratuities rule is to permit employers to *require* tip sharing in some situations.  The Court believes that the divided-gratuities rule is best interpreted to apply to tips left in a tip jar (or the equivalent) and to permit employers to require direct-service employees to share such tips among themselves (though not with the employer).

Specifically, the Court notes that the tip-sharing statute, by its terms, speaks only of "personal services rendered by an employee" — that is, services rendered by an *individual* employee — and does not clearly address services rendered by a *team* of employees.  Minn. Stat. § 177.24, subd. 3.  The tip-sharing statute is written in the singular:  It refers to a tip "received by an employee" or "deposited in or about a place of business for personal services rendered by any employee . . . ."  *Id.*  It forbids an employer to require "an employee" to share tips "received by the employee . . . ."  *Id.*  And it clarifies that it does not prohibit "an employee" from voluntarily sharing gratuities with other employees.  *Id.*  Read as a whole, then, the tip-sharing statute seems to have in mind the traditional tip left on a table by a restaurant patron or handed to a guide by a tourist.  The tip-sharing statute does not seem to address — or address clearly — the status of tips left in tip jars.

-12-

The divided-gratuities rule fills this gap by explaining that "[w]hen more than one direct service employee provides direct service to a customer or customers in a given situation," the direct-service employees may be required to share tips among themselves.  Minn. R. 5200.0080, subp. 8.  Such mandatory tip sharing is consistent with the tip-sharing statute, because the tips being shared among the direct-service employees remain the "sole property" of that particular *group* of direct-service employees — that is, the direct-service employees whose efforts produced the tips.

The question, then, is whether Starbucks's tip-sharing policy is permissible under the tip-sharing statute and divided-gratuities rule.  Specifically, does the rule permit Starbucks to require employees at each store to pool their tips for an entire week and to distribute the pooled tips in proportion to the coverage hours worked by each employee?  This question, in turn, has two parts:  First, over what time period should a group of employees be defined for purposes of sharing tips?  Second, within a particular time period, which employees should be classified as direct-service employees and thus be allowed to participate in the tip pool, and which employees should be classified as indirect-service employees and thus be excluded from the tip pool?

Under the divided-gratuities rule, direct-service employees can be required to share tips only if they work together "in a given situation such as banquets, cocktail and food service combinations, or other combinations . . . ."  Minn. R. 5200.0080, subp. 8.  The key to the rule is the term "given situation."  Those who work as direct-service employees in a "given situation" can be required to share the tips received in that "given situation."

Starbucks contends that the "given situation" in which its employees should be deemed to work together as a team is a particular week at a particular store.  Hr'g Tr. at 63-64 [Docket

-13-

No. 82].  Under Starbucks's theory (as its attorney conceded at oral argument), every barista employed by a particular Starbucks location during a particular week would be deemed to provide direct customer service in combination with every other barista employed by that Starbucks during that week.  *Id.* at 72-73.  This would be true even of two baristas who were unaware of each other's existence.

Unfortunately, though, Starbucks has provided no principled reason for defining the "given situation" as one week in one store.  Why stop at a week?  Why not a month or a year?  And why stop at one store?  Why not all of the stores in a town, or a state, or a nation?  Starbucks provides no answer to these questions.  Its position clearly reflects its desire to protect its current practice and not an analysis of the language or purpose of the divided-gratuities rule.

The Court rejects Starbucks's interpretation of the term "given situation."  The divided-gratuities rule provides that tips may be shared in "a given situation *such as* banquets, [and] cocktail and food service combinations . . . ."  Minn. R. 5200.0080, subp. 8 (emphasis added).  These examples — banquets, and cocktail and food-service combinations — suggest what a "given situation" must look like:  It must look something like a banquet.  A week at a Starbucks store looks nothing like a banquet.

The Court agrees with plaintiffs that the "given situation" at Starbucks that looks most like a banquet — and across which tips may be shared under the divided-gratuities rule — is a shift.  By "shift," the Court means a period of time in which a particular group of employees work together to provide direct service to customers.  If, for example, Baristas *A* and *B* work on a particular day at a particular store from 6:00 a.m. to 7:00 a.m., Barista *C* joins them at 7:00 a.m., Barista *A* stops working at 10:00 a.m., and Baristas *B* and *C* stop working at 12:00 noon, then

three shifts have been worked between 6:00 a.m. and 12:00 noon:  the first from 6:00 a.m. to
7:00 a.m. (*A* and *B*); the second from 7:00 a.m. to 10:00 a.m. (*A*, *B*, and *C*); and the third from
10:00 a.m. to 12:00 noon (*B* and *C*).

The divided-gratuities rule essentially provides that a group of employees who, as a team,
directly serve a group of customers may be required to share tips received from those customers.
By its terms, the rule allows tip sharing among direct-service employees "[w]hen more than one
direct service employee provides direct service to a customer or customers in a given
situation . . . ."  Minn. R. 5200.0080, subp. 8.  When multiple direct-service employees are
working together on the same shift, those employees together provide direct service "to a
customer or customers . . . ."  *Id.*  When a customer of a particular store places a tip in a tip jar,
then Starbucks may require that the tip be shared, but only among those employees who were on
the "team" whose efforts produced the tip — that is, the employees who were working as direct-
service employees at the store when the tip was left.

By contrast, a Starbucks employee who works from 6:00 a.m. to 3:00 p.m. on weekends
does not work directly with, and likely does not share customers with, a different employee who
works from 5:00 p.m. to midnight on weekdays.  Those two employees would both be on a
Starbucks "team" in some abstract sense, but *all* Starbucks employees — no matter the store,
city, state, region, or even country — are on the same Starbucks "team" in some abstract sense.
Obviously, such abstract team membership would not permit Starbucks to pool and divide the
tips of employees in Minneapolis and Beijing.

The Court does not, however, agree with plaintiffs about how to determine which
employees qualify as direct-service employees — that is, how to determine whether an employee

working at a Starbucks store when a tip is left in a tip jar is on the "team" of employees who may share that tip. Plaintiffs acknowledge that every barista and every shift supervisor spends some time on a shift doing things other than direct customer service — for instance, wiping tables, restocking cups and lids, mopping up spills, and the like. Pl. SJ Opp. at 6 ("Any reasonable person recognizes that employees whose regular duties involve performing direct service work will occasionally do work that does not directly involve serving customers."). Plaintiffs do not seek to exclude from a given shift's tip-sharing pool employees who may have done some indirect service during a shift. In other words, plaintiffs do not contend that, when a barista steps away from the service counter to wipe tables for a few minutes, the barista must be precluded from sharing in tips left during those few minutes.

The Court agrees that such exclusion is not required by either the tip-sharing statute or the divided-gratuities rule. The Court also notes that administering such a rule would be extremely difficult. If one shift ended and another shift started every time a direct-service employee left the service counter to wipe tables (or returned to the service counter after wiping tables), then a single day at a Starbucks location might entail dozens of "shifts." If employees had to empty and divide a tip jar every time one of them wiped a table (or returned from wiping a table), employees could spend more time counting tips than serving customers. No one — not the plaintiffs, not the defendant, and not the Court — believes that such minute-by-minute precision is required by Minnesota law.

Plaintiffs, however, *do* contend that such minute-by-minute precision is necessary when an employee who wipes tables or performs other indirect service is *clocked in* as working non-coverage at the time. Put differently, plaintiffs argue that an employee who wipes tables for 15

minutes while remaining clocked in as working coverage may share in tips left during those

15 minutes, but an employee who clocks in as working non-coverage before wiping tables for

15 minutes may not share in tips left during those 15 minutes.  Pl. SJ Opp. at 5-6.  Thus, under

plaintiffs' theory, if (1) Barista *A* and Barista *B* work together on a particular day at a particular

Starbucks store from 6:00 a.m. to 2:00 p.m.; (2) both Barista *A* and Barista *B* perform indirect

service from 9:00 a.m. to 9:30 a.m. (e.g., they work together to help unload a delivery truck); and

(3) Barista *A* was scheduled to do that indirect service (that is, she clocked in from 9:00 a.m. to

9:30 a.m. as working non-coverage), while Barista *B*'s indirect service was unscheduled (that is,

he remained clocked in as working coverage); then (4) Barista *B* may share in any tips that were

placed in the tip jar between 9:00 a.m. and 9:30 a.m., but Barista *A* may not.  As plaintiffs would

have it, Barista *B* gets to share in eight hours of tips, but Barista *A* gets to share in only seven-

and-one-half hours of tips, even though Barista *A* and Barista *B* did precisely the same amount of

direct service and precisely the same amount of indirect service.

Why Barista *B* should receive more tips that Barista *A* in this situation is not apparent.

Indeed, under plaintiffs' theory, if, during that eight-hour day, Barista *A* did 30 minutes of

scheduled indirect service (that is, she clocked in for 30 minutes of non-coverage), while

Barista *B* did 150 minutes of *un*scheduled indirect service (that is, he remained clocked in as

working coverage), then Barista *B* would get to share in the full eight hours of tips, but Barista *A*

would get to share in only seven-and-one-half hours of tips, even though Barista *A* provided two

hours *more* direct service than Barista *B*.

Nothing in the tip-sharing statute or the divided-gratuities rule dictates such an

inequitable result.  And plaintiffs' theory has another problem:  If this Court were to adopt

plaintiffs' reading of Minnesota law, employers such as Starbucks would simply stop scheduling non-coverage time.  In other words, employers would instruct employees to accomplish certain indirect-service tasks each day (such as wiping tables or unloading delivery trucks), but would not require employees to actually clock in and out of non-coverage time.

For these reasons, the Court concludes that an employee's eligibility to share in a tip under Minnesota law does not turn on whether that employee was clocked in as coverage or non-coverage at the precise moment that the tip was deposited in a tip jar.  Again, the unit of measurement that matters under the divided-gratuities rule is the "given situation."  Under the rule, those who "provide[] direct service to . . . customers in a *given situation*" can be required to share gratuities "presented by [those] customers . . . ."  Minn. R. 5200.0080, subp. 8.  And the rule defines "direct service employee" as follows:

> A "direct service employee" is one who in a *given situation* performs direct service for a customer and is to be considered a tipped employee.  An indirect service employee is a person who assists a direct service employee, these include, but are not limited to, bus people, dishwashers, cooks, or hosts.

Minn. R. 5200.0080, subp. 6 (emphasis added).

As the Court has held, in the context of a Starbucks store, a "given situation" is a single shift.  Thus, a direct-service employee is one who, over the course of a shift, is primarily engaged in "perform[ing] direct service for . . . customer[s] . . . ."  *Id.*  Likewise, an indirect-service employee is one who, over the course of a shift, works primarily as a "bus [person], dishwasher[], cook[], or host[]," or in some other capacity in which she primarily "assists a direct service employee . . . ."  *Id.*  Just as a direct-service employee does not become an indirect-service employee by doing a modest amount of indirect service (such as bussing a table), an

indirect-service employee does not become a direct-service employee by doing a modest amount of direct service (such as refilling a coffee cup for a customer).

　If, then, a Starbucks barista is primarily engaged in direct customer service during a particular shift, she may be treated as a direct-service employee for the entire shift.  That is true (as plaintiffs concede) even if she performs a modest amount of indirect service while clocked in as working coverage hours.  And that is true (as plaintiffs do not concede) even if she performs a modest amount of indirect service while clocked in as working non-coverage hours.[8]   It thus seems likely that almost all Starbucks baristas and shift supervisors may be treated as direct-service workers for the entirety of almost all shifts, but this is a factual determination that cannot be decided in the abstract or on this record.[9]

The Court emphasizes the word "may."  It is important to distinguish what Minnesota law *requires* from what Minnesota law *permits*.  The Court finds that Minnesota law does not *require*

---

[8]Although the label under which an employee is clocked in is not determinative, it is nevertheless relevant to whether an employee is primarily engaged in performing direct service to customers during a particular shift.  For example, a Starbucks employee who spent six hours of an eight-hour shift clocked in as non-coverage might have a difficult time convincing a jury that she was primarily engaged in direct customer service during that shift.

[9]In light of the Court's interpretation of the divided-gratuities rule, the Court cannot determine on this record whether Starbucks violates Minnesota law when employees acting as learning coaches are included within a tip pool or when certain employees in training are excluded from the tip pool.  Plaintiffs raise this issue in a single paragraph in their summary-judgment brief.  Pl. Mem. Supp. Mot. S.J. ("Pl. SJ Mem.") at 5-6 [Docket No. 60].  Plaintiffs devote little more than one page of their brief opposing Starbucks's summary-judgment motion to whether learning coaches are direct-service employees.  Pl. SJ Opp. at 4-5.  Further, there appears to be factual disputes over what learning coaches do and when trainees are allowed to share tips.  *Compare* Def. SJ Mem. at 7 *with* Pl. Class Cert. Mem. at 6-7.  The Court therefore declines to grant summary judgment on the issue of whether learning coaches and trainees are direct-service employees.  (It is also possible that these issues are now moot, given that the Court has denied plaintiffs' motion to certify a class.)

that a direct-service employee who performs a modest amount of indirect service be excluded from sharing tips received while she is performing that indirect service, even if she is clocked in as non-coverage at the time. But, as best as the Court can determine, nothing in Minnesota law would *prohibit* an employer from adopting a more precise policy that would permit only those who were actually performing direct service at the time that a tip was left to share in the tip. Thus, if, over the course of an eight-hour shift, a barista spends seven-and-one-half hours providing direct service, and one-half hour providing indirect service, Starbucks *could* exclude the barista from sharing in tips left during the one-half hour of indirect service, but Starbucks would not *have* to do so.

In sum, the Court holds that Starbucks's policy violates Minnesota law by requiring employees who work on a particular shift to share tips received on that shift with employees who do not work on that shift. The Court further holds that, if a Starbucks employee is primarily engaged in performing direct service for customers during a particular shift, then she may be regarded as a direct-service employee for that entire shift, and she may be permitted to share in all tips left in a tip jar during that shift. The employee need not be excluded from tip sharing during the time that she is performing indirect service, whether or not she is formally clocked in as working non-coverage while performing that indirect service.

### 3. Record Keeping

Under Minn. Stat. § 177.30(a)(2), Starbucks must keep records of "the rate of pay, and the amount paid each pay period to each employee[.]" Under Minn. Stat. § 177.30(a)(5), Starbucks must keep records of "other information the commissioner finds necessary and appropriate to enforce [Minn. Stat. §§] 177.21 to 177.35." Plaintiffs contend that Starbucks, by

failing to keep records of plaintiffs' tips, violated both § 177.30(a)(2) — because tips as distributed by Starbucks reflect "the amount paid" to employees — and § 177.30(a)(5) — because records of tips are "information that the commissioner finds necessary and appropriate" to enforce the specified provisions of the Minnesota Fair Labor Standards Act.  Pl. SJ Mem. at 7-9.  The Court disagrees on both points.

Plaintiffs' argument that customer tips are part of employees' pay depends entirely on the fact that under Starbucks's challenged policy for distributing and sharing tips, Starbucks collects tips over the course of a week and distributes them at the end of the week.  But this policy — which the Court has found to violate Minnesota law — does not transform tips into an "amount paid" by Starbucks to its employees.

For one thing, regardless of how the tips are distributed, Starbucks employees will not receive any tips unless customers decide to leave tips.  Starbucks employees will, however, be paid their wages by Starbucks even if not a single customer shows up while the employees are working.

Further, implicit in plaintiffs' argument is a concession that if Starbucks did not collect and distribute their tips — that is, if employees were allowed to divide tips in the tip jar among themselves at the end of each shift — those tips would not be an "amount paid" under Minn. Stat. § 177.30(a)(2).  But whether the tips are split up by Starbucks or by the employees, their *source* — the customers, not Starbucks — remains the same.  The Court sees no reason to treat the exact same money as being "pay" when its division is overseen by Starbucks but as not being "pay" when its division is overseen by the employees themselves.

Moreover, Minnesota law regularly distinguishes between "wages" and "gratuities." Under Minn. Stat. § 177.24, subd. 2, employers are forbidden to "directly or indirectly credit, apply, or utilize gratuities towards payment of the minimum wage . . . ." The Court does not believe that tips and wages should be conflated under Minn. Stat. § 177.30(a)(2) when they are distinguished in related statutes.

Finally, given the inherent variability of tip income, treating tips as an "amount paid" under Minn. Stat. § 177.30(a)(2) would be inconsistent with that subsection's reference to a "rate of pay." That phrase is most naturally read to refer to a pay rate set by an employer, not to a variable rate that would depend on the generosity of customers.

Plaintiffs' argument that records of tips qualify under § 177.30(a)(5) as "other information the commissioner finds necessary and appropriate to enforce" Minnesota law is even weaker. Plaintiffs do not contend that Minnesota's Commissioner of Labor and Industry has ever directed employers to keep records of tips. Instead, plaintiffs ask the Court to read § 177.30(a)(5) to require employers to keep information that the Commissioner *might* find necessary and appropriate to enforce Minnesota law. *See* Pl. SJ Mem. at 9. Plaintiffs argue, in effect, that because the Commissioner might in the future find tip records necessary to enforce the labor laws, the Court should find that Starbucks was required to keep those records in the past. *Id.*

But what the Commissioner might find necessary, if he thought about it, and what the Commissioner actually "finds" — i.e., *does* find, not *might* find — are two different things. This Court is not the Commissioner of Labor and Industry and cannot, on its own, find records necessary under § 177.30(a)(5). There is no evidence that records of tips is "information the

commissioner finds necessary and appropriate to enforce [Minn. Stat. §§] 177.21 to 177.35,"
Minn. Stat. § 177.30(a)(5), and therefore Starbucks is entitled to summary judgment on
plaintiffs' record-keeping claim.

## ORDER

Based on the foregoing and on all of the files, records, and proceedings herein, IT IS
HEREBY ORDERED THAT:

1.      Plaintiffs' motion for class certification [Docket No. 32] is DENIED.

2.      Plaintiffs' motion for summary judgment [Docket No. 58] IS GRANTED IN
        PART and DENIED IN PART as follows:

        a.      With respect to Count I of plaintiffs' second amended complaint, for
                violation of the tip-sharing prohibition in Minn. Stat. § 177.24, plaintiffs'
                motion is GRANTED on the question of liability, to the extent described
                above.

        b.      With respect to Count II of plaintiffs' second amended complaint, for
                violation of Minn. Stat. § 177.30,[10] plaintiffs' motion is DENIED.

3.      The motion of defendant Starbucks Coffee Corporation for summary judgment
        [Docket No. 52] is GRANTED IN PART and DENIED IN PART as follows:

        a.      With respect to Count I of plaintiffs' second amended complaint, for
                violation of the tip-sharing prohibition in Minn. Stat. § 177.24,
                defendant's motion is DENIED.

---

[10]The title of Count II of plaintiffs' second amended complaint refers to Minn. Stat.
§ 177.24, not Minn. Stat. § 177.30.  Because this appears to be a typographical error, the Court
refers to Count II as raising a claim under Minn. Stat. § 177.30.

      b.      With respect to Count II of plaintiffs' second amended complaint, for violation of Minn. Stat. § 177.30, defendant's motion is GRANTED. Count 2 of plaintiffs' second amended complaint is DISMISSED WITH PREJUDICE AND ON THE MERITS.

Dated:  September  30 , 2009

s/Patrick J. Schiltz
Patrick J. Schiltz
United States District Judge